*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-1250

SHOLANDA MILLER,
APPELLANT,

v.

DISTRICT OF COLUMBIA
OFFICE OF EMPLOYEE APPEALS, *ET AL.*,
APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAP 4500-17)

(Hon. Michael L. Rankin, Motion Judge)

(Submitted March 18, 2020                Decided September 10, 2020)

*Gregory L. Lattimer* was on the brief for appellant.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Carl J. Schifferle*, Senior Assistant Attorney General were on the brief for appellee Metropolitan Police Department.

*Lasheka Brown Bassey* filed a statement in lieu of brief for appellee District of Columbia Office of Employee Appeals.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and EPSTEIN, *Associate Judge of the Superior Court*.*

EPSTEIN, *Associate Judge*:   The Metropolitan Police Department ("MPD") terminated appellant Sholanda Miller's employment as a police officer because of her complicity in the criminal activities of her boyfriend.  Primarily on procedural grounds, Ms. Miller challenges the decision of the Office of Employee Appeals ("OEA") upholding her termination and the subsequent decision of the Superior Court upholding OEA's decision.  We affirm.

## I.  Background

The relevant facts are not disputed.

Until 2010, MPD employed Ms. Miller as a police officer.  At the time, Ms. Miller lived with Eric Shorts, with whom she was romantically involved.  During an investigation of a drug distribution enterprise, the Federal Bureau of Investigation wiretapped Mr. Shorts' telephone.  In recorded calls, Mr. Shorts disclosed recent criminal activity to Ms. Miller and thanked her for informing him of increases in police presence.  Ms. Miller did not report any of this information to MPD.

---

*   Sitting by designation as authorized by D.C. Code § 11-707(a) (2012 Repl).

Shortly after Mr. Shorts was arrested, MPD revoked Ms. Miller's police powers and referred the matter to the U.S. Attorney's Office. On July 20, 2009, the U.S. Attorney's Office issued a letter of declination stating that it would not bring criminal charges against Ms. Miller.

On November 23, 2009, MPD issued a Notice of Proposed Adverse Action ("NPAA") recommending a 15-day suspension for Ms. Miller. The NPAA gave Ms. Miller 15 days to submit a response, including evidence to controvert or mitigate the facts set forth in the investigative report. The NPAA informed Ms. Miller that if she did not file a response within 15 days, "the charges and specification as outlined will be evaluated based upon the evidence of record." Ms. Miller did not submit a response to the NPAA.

On February 1, 2010, MPD issued an Amended Notice of Proposed Adverse Action recommending termination of Ms. Miller's employment. The amended NPAA gave Ms. Miller six days to submit a written response and to request a hearing, which would occur on February 8, 2010.

By letter dated February 3, Ms. Miller requested a continuance of the February 8 hearing and "agree[d] to waive the 55-day rule as it applies to the length of this requested continuance." MPD granted the request and continued the hearing to April 6. By letter dated April 1, Ms. Miller requested another

continuance and "agree[d] to waive the 55-day rule as it applies to the length of this requested continuance."  MPD granted this request and continued the hearing to June 8.  On April 6, Ms. Miller responded to the amended notice, stating "I have not submitted a request for a departmental hearing."

On April 13, MPD issued a final notice of adverse action finding Ms. Miller guilty of misconduct and imposing a penalty of termination.

Ms. Miller appealed the final notice to the then-Chief of Police Cathy L. Lanier.  On May 7, 2010, Chief Lanier denied the appeal.

Ms. Miller appealed to OEA, and an OEA administrative judge upheld her termination on December 30, 2013.  On April 14, 2015, the OEA Board affirmed in part and reversed and remanded in part.

On May 6, 2016, the administrative judge issued a decision on remand and again upheld MPD's decision to terminate Ms. Miller's employment.  On June 6, 2017, the OEA Board affirmed.

Ms. Miller petitioned the Superior Court for review of the OEA Board's decision.  On October 30, 2018, the Superior Court affirmed.

Ms. Miller timely appealed to this court.

## II. Discussion

Ms. Miller raises three issues. We address each in turn.

"When reviewing an appeal of an OEA decision, we are confined strictly to the administrative record and must affirm the OEA's decision so long as it is supported by substantial evidence in the record and otherwise in accordance with law." *Dupree v. D.C. Office of Employee Appeals*, 36 A.3d 826, 830 (D.C. 2011) (cleaned up). "Questions of law, including questions regarding the interpretation of a statute or regulation, are reviewed de novo." *Stevens v. D.C. Department of Health*, 150 A.3d 307, 312 (D.C. 2016) (cleaned up). "This court routinely accords great deference to the OEA's interpretation of the statute which it administers." *Id*. at 318 (cleaned up). We likewise "defer to the OEA's interpretation of the personnel regulations," given its "expertise in administering and enforcing" those regulations. *Hutchinson v. D.C. Office of Employee Appeals*, 710 A.2d 227, 234 (D.C. 1998).

### A. The 90-day rule

Ms. Miller contends that MPD violated the so-called "90-day rule" in D.C. Code § 5-1031 (2019 Repl.) because MPD issued its amended NPAA recommending termination more than 90 days after the conclusion of the criminal investigation of Ms. Miller. However, the statute requires only that MPD

*commence* a disciplinary proceeding within 90 days after the conclusion of a criminal investigation, and MPD complied with this deadline.

D.C. Code § 5-1031 provides that "no corrective or adverse action against any" employee "shall be commenced more than 90 days" (excluding weekends and holidays) after the date MPD "had notice of the act or occurrence allegedly constituting cause" for the corrective or adverse action. Section 5-1031(b) provides, "If the act or occurrence allegedly constituting cause is the subject of a criminal investigation, . . the 90-day period for commencing a corrective or adverse action. . . shall be tolled until the conclusion of the investigation." Here, it is undisputed that (1) the 90-day period was tolled until the U.S. Attorney's Office issued its declination letter on July 30, 2009, (2) November 25 was the 90th business after July 30, and (3) MPD issued the NPAA commencing the disciplinary proceeding on November 23.

Ms. Miller argues that § 5-1031 imposes a deadline not only to commence a disciplinary proceeding by issuing an NPAA but also to propose the specific penalty that may be imposed at the end of the proceeding. In questions of statutory interpretation, "[w]e must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)

(cleaned up). By its plain terms, § 5-1031 sets a deadline only for the commencement of a disciplinary proceeding and not to propose the resulting discipline. *See D.C. Office of Tax & Revenue v. Sunbelt Beverage, LLC*, 64 A.3d 138, 148 (D.C. 2013) (discussing "the obligation to construe statutes of limitations strictly in favor of the government"). In addition, although the significance of a title should not be exaggerated, *Facebook, Inc. v. Wint*, 199 A.3d 625, 629-30 (D.C. 2019), the title of a section may be a useful aid in resolving an ambiguity in the statutory language, *Mitchell v. United States*, 64 A.3d 154, 156 (D.C. 2013), and the title of § 5-1031 is "Commencement of corrective or adverse action."

We ordinarily do not probe legislative intent when, as here, the statutory language is plain, *Kelly v. D.C. Department of Employment Services*, 214 A.3d 996, 1009 n.11 (D.C. 2019), although "in certain circumstances it is appropriate to look beyond even the plain and unambiguous language of a statute to understand the legislative intent." *D.C. Appleseed Center for Law and Justice, Inc. v. D.C. Department of Insurance, Securities and Banking*, 54 A.3d 1188, 1214 (D.C. 2012) (cleaned up). The legislative history states that § 5-1031 addresses "when the disciplinary process must begin." *See* Committee on the Judiciary of the D.C. Council, Report on Bill 15-32, the "Omnibus Public Safety Agency Reform Amendment Act of 2003," at 15 (Dec. 9, 2003). To be sure, the legislative history evinces concern about delays in other parts of the disciplinary process, especially

delays in the processing of cases by OEA. *See* Report at 14-15. However, the committee report, like the text of § 5-1031, indicates that the delays addressed by the legislation are delays in the commencement of the disciplinary process by the employing agency.[1] If the legislative materials provide any support for Ms. Miller's interpretation of § 5-1031, the support is at best weak, and these materials therefore cannot be permitted to control the customary meaning of the words of the statute. *See Peoples Drug Stores*, 470 A.2d at 755.

Contrary to Ms. Miller's contention, MPD's ability to amend proposed discipline during the course of a proceeding commenced within the 90-day period does not make the 90-day rule "meaningless." The 90-day rule still limits the time that MPD has to decide whether to initiate a disciplinary proceeding. As MPD argues, Ms. Miller's interpretation would give MPD an incentive "to institute a raft of questionable charges and propose the harshest conceivable penalty in every case, out of fear that there will be no opportunity to later amend."

---

[1] In *D.C. Fire and Emergency Medical Services Department v. D.C. Office of Employee Appeals*, 986 A.2d 419, 425 (D.C. 2010), we cited legislative materials stating that the statute limits the amount of time employees had to wait "to see the conclusion of an investigation against them" and to learn whether the employing agency would commence a disciplinary proceeding. It was in this context that we went on to cite (as Ms. Miller points out) additional language in the committee report that "[t]he deadline was intended to bring 'certainty' to employees over whose heads a potential adverse action might otherwise linger indefinitely." *Id.* (quoting legislative history). As the context makes clear, and as MPD states, the "certainty" provided by the time limit in § 5-1031 involves whether or not MPD will bring disciplinary charges at all.

Ms. Miller argues that MPD should not have unfettered authority to add new charges or to propose stronger discipline after a disciplinary proceeding has commenced. We agree that MPD does not have carte blanche to amend the initial charges at any time. For example, as discussed in the next section, the 55-day rule helps to prevent unreasonable delays in amending charges or proposed discipline. However, constraints on the timing and scope of MPD's authority to amend initial notices are not contained in § 5-1031, which limits only the time that MPD has to initiate a disciplinary proceeding.

## B. The 55-day rule

MPD complied with the 55-day rule because it issued its final decision within 55 business days after it notified Ms. Miller of the charges, excluding the duration of the two continuances requested by Ms. Miller through her then-attorney.

The collective bargaining agreement ("CBA") between MPD and the police officers' union establishes a "55-day rule." Section 6 of Article 12 of the CBA provides, "The employee shall be given a written decision, and the reasons therefore no later than fifty-five (55) business days after the date the employee is notified in writing of the charges or the date the employee elects to have a departmental hearing, where applicable." Sections 6(a)-(c) provide for three

exceptions that extend the 55-day time limit. One of these exceptions is that "when an employee requests and is granted a postponement or continuance of a scheduled hearing, the fifty-five (55) business day time limit shall be extended by the length of the delay or continuance."

MPD issued its final notice of adverse action terminating Ms. Miller's employment on April 13, 2010, which is more than 55 business days after November 23, 2009 when MPD issued the NPAA notifying her of the initial charges. In response to Ms. Miller's contention that MPD thereby violated the 55-day rule, MPD makes two arguments: (1) the 55-day clock did not start until February 1, 2010 when MPD issued the amended NPAA; and (2) when the length of the two continuances requested by Ms. Miller is excluded, 55 business days elapsed between issuance of the original NPAA and written notification of MPD's decision.

We are not persuaded by MPD's first argument that amending the NPAA restarted the 55-day clock. Under standard principles of contract interpretation applicable to the CBA, the initial issue is whether the CBA unambiguously extends the 55-day period if MPD amends the charges or proposed discipline. *See 2301 M St. Cooperative Ass'n v. Chromium LLC*, 209 A.3d 82, 87 (D.C. 2019). By its plain language, the CBA provides only three exceptions to the rule that MPD issue

a written decision within 55 business days after it commences a disciplinary proceeding, and the three exceptions do not include amendment of the original charges or of the proposed discipline. MPD does not, and could not, contend that the CBA unambiguously compels its interpretation, nor does it offer any parol evidence to support its interpretation. *See id*.

MPD's interpretation would defeat the apparent purpose of the 55-day rule. It is reasonable to interpret this rule to set an outside limit on the duration of a disciplinary proceeding so that employees are not indefinitely in limbo and are guaranteed a decision within a fixed period of time. *See Valdes v. D.C. Metropolitan Police Department*, OEA Matter No. 1601-0009-04, Opinion and Order at 7 n.12 (OEA Sep. 16, 2009) ("violation of the 55-day rule is an absolute bar to the finalization of an adverse action."). MPD's interpretation of the 55-day rule would create a substantial loophole that permits MPD to give itself potentially unlimited time to issue a written decision by amending the charges or the proposed discipline.

MPD argues strenuously that it has the right to amend its notice, and we do not dispute that it does. However, the issue here is not whether MPD can amend its initial notice but whether the amendment restarts the 55-day clock. We again stress that MPD does not have unconstrained authority to amend the original

notice, and it cannot force employees to choose between a fair opportunity to respond to an amended notice and relinquishment of their right to a decision within the time permitted by the 55-day rule. MPD's authority to amend the notice does not affect its obligation to issue a written decision within 55 business days after the initial notice.

MPD's second argument is based on the continuances that Ms. Miller requested. When these continuances are excluded, the final decision was issued within 55 business days from the date of the original notice. The problem for MPD is procedural: MPD did not make this argument to OEA; and in general, "an administrative agency's decision can be sustained on review only on the grounds on which the agency actually relied." *Black v. D.C. Department of Human Services*, 188 A.3d 840, 850 (D.C. 2018) (cleaned up).

Despite this general rule, we address such arguments in exceptional circumstances where manifest injustice would otherwise result, and we apply this exception with "a measure of flexibility." *See Love v. D.C. Office of Employee Appeals*, 90 A.3d 412, 423 (D.C. 2014) (cleaned up). In the exceptional circumstances of this case, manifest injustice would result if we treated MPD has having waived its argument concerning the 55-day rule.

First, the operative facts are simple and undisputed: one exception to the 55-day rule unambiguously provides that "when an employee requests and is granted a postponement or continuance of a scheduled hearing, the fifty-five (55) business day time limit shall be extended by the length of the delay or continuance;" Ms. Miller requested and was granted continuances of two scheduled hearings; and when the length of these continuances is excluded, MPD issued its written decision within 55 days after it issued the initial NPAA. Second, MPD's position is supported by OEA precedent concluding that the 55-day clock stops during a continuance even if the employee ultimately does not want a hearing: OEA has ruled that an employee "can not invoke the rule when it's convenient for him, and then use it against Agency after he withdrew his request." *See Valdes*, Opinion and Order at 7. Third, in her appeal to Chief Lanier, Ms. Miller argued that MPD violated the 55-day rule, and Chief Lanier rejected Ms. Miller's contention that the 55-day clock continued to run during the continuances requested by Ms. Miller because she ultimately did not request a hearing. Fourth, Ms. Miller never disputed the fact that she engaged in serious misconduct and that termination was appropriate discipline, and it would be manifestly unjust to reinstate – with a decade of back pay – a sworn police officer who violated her oath to protect the community and who betrayed its trust as seriously as Ms. Miller did.

We could remand to give OEA an opportunity to address whether the hearing continuances requested by Ms. Miller should be excluded in determining whether MPD complied with the 55-day rule. Here, however, for the reasons we explain in the preceding paragraph, a remand is unnecessary because "the agency would doubtless reach the same result" and "it is clear what the agency's decision [on remand] has to be." *See Black*, 188 A.3d at 851 (internal quotation marks and citations omitted). Although the letters from Ms. Miller's lawyer requesting the continuances are not part of the current record, she does not dispute the authenticity of the letters that MPD provided to us, and OEA has discretion to reopen the record to allow additional evidence. *See* OEA Rule 629.2 (6 DCMR § B629.2) (providing that the administrative judge may reopen the record after it has been closed).

For these reasons, MPD did not violate the CBA's 55-day rule.

### C.   Offer and acceptance

Ms. Miller's third and final argument is that MPD was precluded from terminating her employment because MPD's initial NPAA constituted an offer of a suspension and she accepted the offer by failing to respond to it. That is not a reasonable characterization of the NPAA or of Ms. Miller's response.

First, the NPAA was not an offer under contract law. As we explained in Part I, the NPAA gave Ms. Miller 15 days to submit a response and informed her that if she did not do so, "the charges and specification as outlined will be evaluated based upon the evidence of record." The NPAA thus made explicit that her failure to respond meant not that MPD would automatically suspend her for 15 days but rather that it would evaluate the charge based on the evidence.

Second, even if the NPAA were (incorrectly) construed as an offer, Ms. Miller's failure to respond would not constitute an acceptance. The general rule in contract law is that "silence does not result in acceptance." *Steuart Investment Co. v. Meyer Group*, 61 A.3d 1227, 1236 n.10 (D.C. 2013). Ms. Miller does not argue, much less demonstrate, that any exception to this general rule applies.

Accordingly, MPD was not precluded from reconsidering its initial recommendation of suspension and deciding termination was warranted because of the seriousness of Ms. Miller's misconduct.

### III. Conclusion

For these reasons, we affirm the judgment upholding OEA's decision concerning termination of Ms. Miller's employment.